**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | : | |
| | : | |
| **v.** | : | **Case No. 25-CR-88 (SLS)** |
| | : | |
| **DEWAYNE ANTHONY SHORTER, JR.** | : | |
| | : | |
| **Defendant.** | : | |

**UNITED STATES' SENTENCING MEMORANDUM**

The United States of America, by and through its attorneys, the United States Attorney for the District of Columbia and undersigned counsel, hereby files its sentencing memorandum to assist the Court's consideration of the relevant issues. As noted below, Defendant faces an advisory Guidelines range of 68 months to 74 months.  For the reasons articulated below, the United States respectfully recommends that the Court impose a sentence of **74** months' imprisonment to be followed by 36 months' supervised release.

**PROCEDURAL HISTORY AND RELEVANT FACTS**

At approximately 7:40p.m. on January 28, 2025, the Metropolitan Police Department's ("MPD'S") Robbery Suppression Unit ("RSU") were conducting enforcement operations at a corner store located at 2237 Minnesota Avenue, Southeast. MPD officers observed a white, 2022 Infiniti QX50 Sports Utility Vehicle bearing D.C. registration GU2254 (hereinafter the "INFINITI SUV") parked against the curb in front of that location.

While on scene, MPD Sergeant Welsh – with the assistance of his flashlight – looked through the INFINITI SUV's windows for signs of contraband in plain view, as shown in the still below.  While looking through the rear, passenger side window, Sergeant Welsh observed what he recognized through his training and experience to be heat-sealed bags containing a green, leafy substance consistent in appearance with marijuana. Based on the size of the heat-sealed bags,

1

Sergeant Welsh believed that they contained more than two ounces of green, leafy substance.  D.C. law prohibits the possession of more than two ounces of marijuana.  Sergeant Welsh immediately requested assistance for a probable cause search of the INFINITI SUV based on the suspected marijuana observed in plain view.



MPD officers used a "lockout kit" to open the INFINITI SUV's door, at which time they retrieved two heat-sealed bags containing a green, leafy substance as well as a large plastic "turkey bag" containing  a smaller amount of that same substance. The green, leafy substance field tested positive for the presence of THC.  It was later determined that the three bags contained a total of 1,245 grams (approximately 2.75 pounds or 44 ounces) of suspected marijuana.



After retrieving the suspected marijuana, the officers continued with a probable cause search of the INFINITI SUV for additional evidence of marijuana distribution.  During that search, officers located $2,428.25 in United States currency as well as additional, suspected controlled substances consisting of: a white, rocklike substance that was later determined to weigh 29.8 grams (this subject field-tested positive for cocaine base but is suspected by officers to be dimethylpentylone or "boot"), 2 jars of a waxy substance (suspected THC wax), and .6 grams of brown powder (suspected heroin) in the front passenger area.

Officers also recovered three firearms from the front passenger floorboard of the INFINITI SUV.  Those firearms are described as follows:

- A tan Glock, Model 19x, 9mm semi-automatic handgun with serial number BTZU422, located in the front passenger's seat.  The Glock 19x was loaded with one round in the chamber and 18 rounds of ammunition in a high-capacity magazine.



- A tan and black Aero Precision, Model M4E1, 5.56mm/.223 caliber semi-automatic AR-Pistol with serial number M4-0221208, located in the front passenger floorboard. The Aero Precision M4E1 was loaded with one round in the chamber and 35 rounds of ammunition in a 60 round capacity drum magazine



- A black DTI-15, 5.56mm caliber semi-automatic AR-Pistol with serial number DTI-S117680, also located in the front passenger floorboard. The DTI-15 was loaded with 15 rounds of ammunition in an unknown capacity magazine.



- A black bag containing a 100-round capacity "double drum" magazine loaded with 94 rounds of 5.56mm/.223 caliber ammunition.



***Evidence Connecting DEWAYNE ANTHONY SHORTER, JR. to the INFINITI SUV***

A DMV records check confirmed that the INFINITI SUV is registered to SHORTER, and he has been stopped by police operating the INFINITI SUV as recently as January 9, 2025, in Prince George's County, Maryland. The MPD Database also shows that SHORTER contacted MPD to report that other persons had caused damaged to the INFINITI SUV, which he claimed ownership of. These reports were made on May 22, 2022, and April 1, 2023, and were recorded in MPD Criminal Case Number ("CCNs") 22-073-097 and 23-050-673, respectively.

In addition, MPD Officers recovered multiple pieces of evidence linking SHORTER to the INFINITI SUV on January 28, 2025. This evidence included employment paperwork made out in SHORTER's name, and a site access badge issued to SHORTER.





***Evidence of SHORTER'S Drug Distribution Activity
and Use of the INFINITI SUV on January 28, 2025***

On January 30, 2025, MPD Detectives responded to the 2200 block of Minnesota Avenue, Southeast, to view the scene where the search of the INFINITI SUV occurred. Two business had surveillance cameras that appeared to capture the area where the search occurred: Minnesota Liquors, located at 2237 Minnesota Avenue, Southeast, and Surprise Grocery, located at 2233 Minnesota Avenue, Southeast. Law enforcement requested access to surveillance video footage from those two businesses for the relevant time period, and the surveillance video was made available.

On February 3, 2025, MPD Detectives received and viewed surveillance video provided by the Minnesota Liquors and Surprise Grocery, and observed SHORTER in surveillance video from both businesses.  SHORTER was observed to be wearing a black, hooded sweatshirt with images of angels and stars on the front as well as dark colored pants, black shoes, and a brown stocking hat.



MPD Detectives compared the time stamp from Body Worn Camera ("BWC") worn by an MPD Officer who was also on scene, and confirmed that the time stamp on surveillance video from Minnesota Liquors was accurate and in sync with the BWC footage. MPD Detectives compared the time stamp from the BWC worn by an MPD Officer who was also on scene, and confirmed that the time stamp on surveillance video from Surprise Grocery is accurate to within approximately one second. Having confirmed the time stamps' accuracy, MPD Detectives were able to recreate the events of January 28, 2025, prior to the arrival of MPD officers.

At approximately 19:06:12, the INFINITI SUV arrives and parks on Minnesota Avenue, Southeast, adjacent to Minnesota Liquors.



Video from Minnesota Liquors shows that SHORTER exits the INFINITY SUV at approximately 19:08:48. As SHORTER walks away from the INFINITI SUV and across Minnesota Avenue, Southeast, the lights flash twice, consistent with the doors being locked electronically.



Surveillance video confirms that SHORTER walked back across the street and entered Surprise Grocery at approximately 19:09:37 hours.



Video from the inside Surprise Grocery does not have an on-screen time stamp, but MPD Detectives were able to estimate the time of the following events based on the time stamp when SHORTER entered Surprise Grocery and the amount of time that elapsed after that point. Using that method, SHORTER became visible on Surprise Grocery's internal, high-quality surveillance camera at approximately 19:10:01. The surveillance photo was able to capture SHORTER's face.



In the video, SHORTER appears to have one Apple AirPod, or similar earbud device, in his left ear. SHORTER continues to loiter about with other individuals just inside the entrance of Surprise Grocery for approximately ten minutes. Surprise Grocery is known to law enforcement as an area where individuals sell illegal narcotics.



At approximately 19:20:39, SHORTER exited Surprise Grocery and, at approximately 19:21:00, arrived at the INFINITI. SHORTER then opened the front passenger door and leaned into the front passenger door. SHORTER appeared to be reaching for an object that was on, or in

front of, the front passenger seat. This is the area where MPD officers later recovered the firearms,

suspect "boot," and suspected heroin during a probable cause search.



SHORTER then withdrew from the INFINITI, closed the front passenger door, and touches

the door handle causing the lights to flash twice, consistent with the doors being locked

electronically. SHORTER then returned to Surprise Grocery.



At approximately 19:21:58, SHORTER re-enters Surprise Grocery and operates a cellular

telephone with his left hand, as shown in the still below. SHORTER then exited Surprise Grocery

at approximately 19:22:27, thirty seconds after he entered.



At approximately 19:22:51, SHORTER arrived at the INFINITI and again opened the front passenger door and leaned into the vehicle. The surveillance video shows SHORTER reaching into the front passenger seat area and toward the passenger seat floorboard. SHORTER can be seen making small movements with his body, consistent with manipulating or moving objects.



SHORTER then stood up and appeared to be about to leave the INFINITI, and then leaned back into the vehicle with his left hand as if to move, reposition, or grab something. SHORTER walked away from the INFINITI at approximately 19:23:39. At approximately 19:23:48, the lights

on the ININITI flashed twice, consistent with SHORTER remotely locking the doors electronically (such as via a key fob).



SHORTER re-entered Surprise Grocery at approximately 19:23:57. Upon entering the store, SHORTER made hand contact with his right hand to the left hand of a man wearing an Oakland Athletics hat, who had also been loitering in and around Surprise Grocery.



The man with the Athletics then walked a few feet away from SHORTER and put made hand contact with his left hand to the right hand of a third subject's left hand, consistent with a hand-to-hand drug transaction.



At approximately 19:35:18, SHORTER again appeared to be operating a cellular telephone while also holding a set of keys.



MPD Detectives reviewed the entirety of the surveillance footage from the Minnesota Liquors' exterior surveillance camera, which ran from 19:05:00 to 19:41:02 on January 28, 2025. The exterior camera faces directly toward the area where the INFINITI SUV was parked. MPD Detectives observed that SHORTER was the only person seen entering, exiting, or accessing the INFINITI SUV.



The Minnesota Liquors surveillance footage ends at 19:41:02. According to BWC footage, Sergeant Welsh walked past the INFINITI SUV at 19:41:16.  As can be seen in the screen capture below, other MPD officers arrived on the scene prior to Sergeant Welsh.



***Issuance of Criminal Complaint, Arrest Warrant, and Search Warrants for SHORTER and his Property by the United States District Court for the District of Columbia***

On February 11, 2025, United States Magistrate Judge Zia M. Faruqui signed a Criminal Complaint in Case Number 25-MJ-26, and issued a warrant for SHORTER's arrest.

On February 13, 2025, United States Magistrate Judge Zia M. Faruqui issued Search Warrants 25-SW-27 and 25-SC-178, which authorized the collection of geolocation "pings" issued by SHORTER's cellular telephone and also authorized the search of that cellular telephone and the collection of a sample of SHORTER's DNA by way of a buccal swab. On February 25, 2025, United States Magistrate Judge Moxila A. Upadhyaya issued Search Warrants 25-SW-44 and 25-SC-285, which authorized the use of a cell-site simulator and further authorized a search of SHORTER's residence.

On February 27, 2025, United States Magistrate Judge Moxila A. Upadhyaya issued Search Warrant 25-SW-45, which authorized the search of SHORTER's cellular telephone and a collection of a sample of SHORTER's DNA by way of a buccal swab. The United States requested this warrant because 25-SW-27 was not executed within the 14-day time limit established on the face of that warrant.

### *Arrest of SHORTER and Search of SHORTER's Residence*

MPD Officers arrested SHORTER on February 28, 2025, pursuant to the outstanding arrest warrant in Case Number 25-SW-26. SHORTER was arrested outside, in an area behind the apartment building located at 1412 Young Street, Southeast. At the time of his arrest, SHORTER was holding two cellular telephones. Search incident to arrest, officers also recovered two vials containing a white liquid substance that field-tested positive for the presence of amphetamines.

After taking SHORTER into custody, MPD officers executed Search Warrant 25-SW-44 on the residence located at 1412 Young Street, Southeast, Apartment 6. Officers knocked on the door and announced that they had a search warrant. When no one answered the door after a reasonable time, Officers made forced entry into the apartment. Upon entering the apartment,

officers encountered a female sitting in the living room with a small child. The officers later confirmed that the woman is SHORTER's romantic partner.

The officers removed the female and child from the residence, and executed a security sweep to ensure that there were no other occupants. Officers then conducted a search of the residence and discovered the following items.

- A Ruger, Model 57, 5.7x28mm semi-automatic handgun, bearing serial number 643-60974. The Ruger 57 was loaded with one round in the chamber and 20 rounds of ammunition;



- An FNH 5.7x28mm semi-automatic handgun, bearing serial number 386219654. The FNH handgun was loaded with one round in the chamber and 19 rounds in a high-capacity magazine;



- Two upper receivers chambered for a 5.56x45mm AR-15 style rifle;



- Two lower receivers for an AR-15 style rifle;



- Three rifle magazines containing a total of 57 rounds of 5.56x45mm ammunition;

 



- A high-capacity handgun magazine loaded with 29 rounds of 9mm ammunition;



The Officers also recovered $2,140 in United States currency and the following drug-related evidence:

1.      empty pill capsules consistent with drug distribution;

2.      44 blue capsules, containing a total of 18 grams of white rock substance that field-tested positive for cocaine base

3.      Four clear plastic bags containing a total of 28 grams of tan powder that field tested positive for Fentanyl.

4.      One clear jar containing THC wax;

5.      One mylar bag containing 30 grams of synthetic cannabinoids (K2).

## ANALYSIS

## I.      UNITED STATES' ANALYSIS OF THE SENTENCING GUIDELINES

Even though the Sentencing Guidelines are advisory, United States v. Booker provides that sentencing courts "must consult those Guidelines and take them into account when sentencing." 543 U.S. 220, 264 (2005) (cited in United States v. Brown, 892 F.3d 385, 399 (D.C. Cir. 2018)). The Supreme Court has noted that the Guidelines provide "the starting point and the initial benchmark" for sentencing. Gall v. United States, 590 U.S. 38, 49 (2007); see also United States v. Dorcely, 454 F.3d 366, 375 (D.C. Cir. 2006) ("Booker has not changed how the Guidelines range is to be calculated."). Moreover, the Guidelines' recommended sentencing range will ordinarily "'reflect a rough approximation of sentences that might achieve [18 U.S.C.] § 3553(a)'s objectives.'" Kimbrough v. United States, 552 U.S. 85, 108-09 (2007) (quoting Rita v. United States, 551 U.S. 338, 347-50 (2007)); see also Dorcely, 454 F.3d at 376 (noting that "a sentence within a properly calculated Guidelines range is entitled to a rebuttable presumption of reasonableness").

To calculate a Guidelines sentence, the Court must first select the applicable offense guideline and then select the base offense level within that applicable offense guideline. United

States v. Flores, 912 F.3d 613, 616 (D.C. Cir. 2019). As the D.C. Circuit has long held, this inquiry

must include an evaluation of all relevant conduct that could affect the Guidelines calculation.

> In the post-Booker world, the court must calculate and consider the applicable
> Guidelines range but is not bound by it. Under the Guidelines, "the sentencing
> range for a particular offense is determined on the basis of all 'relevant conduct'
> in which the defendant was engaged and not just with regard to the conduct
> underlying the offense of conviction." Witte v. United States, 515 U.S. 389, 393
> (1995) (citing U.S.S.G. § 1B1.3). Section 1B1.3 details the conduct the
> sentencing court may consider in determining the applicable Guidelines range
> and the commentary to that section states, "Conduct that is not formally charged
> or is not an element of the offense of conviction may enter into the determination
> of the applicable guideline sentencing range." U.S.S.G. § 1B1.3, comment.,
> backg'd.

Dorcely, 454 F.3d at 375.

### A.    Calculation of SHORTER's Criminal History Category

SHORTER was convicted of Assault With a Dangerous Weapon, Carrying a Pistol Without

a License and Felony Assault on a Police Officer in D.C. Superior Court 2007 CF3 6769.  On

October 27, 2008, SHORTER was sentenced to 82 months' imprisonment for that offense.

SHORTER was apparently released on parole in that case but returned to prison following his

conviction in 2009 CF2 7464. This offense warrants 3 criminal history points pursuant to U.S.S.G.

§§ 4A1.1(a), 4A1.2(c)(1).

Accordingly, SHORTER has three criminal history points, placing him in Criminal History

Category ("CHC") II.

### B.    Calculation of SHORTER'S Advisory Guidelines Range

The United States calculates Defendant's Offense Level as follows:

Count One

| | | |
|---|---|---|
| U.S.S.G. §§ 2D1.1(a)(5), (c)(14) | Base Offense Level | 12 |
| U.S.S.G. § 3E1.1 | Acceptance of Responsibility | - 2 |
| | **Total:** | **10** |

Offense Level 10 in Criminal History Category II calls for an advisory guideline range of 8 to 14 months' imprisonment.

Count Two

The parties agree that, pursuant to U.S.S.G. § 2K2.4(b), the guideline range for a violation of 18 U.S.C. § 924(c)(1)(A)(i) is 60 months, which is also the mandatory minimum sentence.  By statute, any sentence imposed for Count Two must run consecutively to any sentence imposed for Count One.

## II.    UNITED STATES' ANALYSIS OF THE STATUTORY SENTENCING FACTORS

### A.    The Nature and Circumstances of the Offense

Within the span of 30 days, MPD Officers seized three handguns, four rifles, and 291 total rounds of ammunition from an apartment and vehicle under SHORTER's direct control.  Officers also seized a substantial quantity of suspected narcotics which tested positive for the presence of cocaine base, heroin, fentanyl, amphetamines THC, and synthetic cannabinoids.  SHORTER, a convicted felon, has been unable to legally own a firearm since October 27, 2008.

While all firearms pose a substantial danger to law enforcement, the four rifles seized from SHORTER were especially dangerous.  This is true because 5.56x45mm rifle ammunition, fired form an AR-15 style rifle, is capable of piercing the protective vests worn by MPD Patrol Officers.

### B.    SHORTER's History and Characteristics

SHORTER was convicted in Case Number 2007 CF3 6769 of Assault with a Dangerous Weapon, Carrying a Pistol Without a License, and Felony Assault on a Police Officer.

SHORTER pled guilty to the lesser-included offenses of Assault on a Police Officer and Simple Assault in Case Number 2009 CF2 7464.

More recently, SHORTER was charged with First Degree Murder While Armed in Case Number 2017 CF1 014127.   In that case SHORTER was alleged to have fired 50 rounds of ammunition at the victim, striking him 32 times.   After he was acquitted of that case, a digital video was posted to Instagram with the caption: "Young n**** broke a record for the hood."



During that video a conversation was had between SHORTER and an unknown male.   A rough transcription of that conversation follows:

UM:    I got a question for you…. Hold on, hold on, hold on, 'cause when I read the medical examiner joint and it said you shot him that many times, I said 'his aim is not better than mine.'

[LAUGHTER]

SHORTER:   Shittin' me!  Hey, that's 32 out of 50.  [shooting basketball gesture].

[LAUGHTER]

SHORTER:    If I was at the free throw line, they'd call me Steph Curry.

In addition, among the evidence recovered from SHORTER's residence was a handwritten

document depicting questions and answers. When asked about this document, SHORTER admitted that he prepared the document and gave it to his attorney in hopes of convincing a specific individual to testify falsely on SHORTER's behalf at trial. SHORTER further stated that the individual did not in fact testify at his trial.



### C.  The Need to Reflect the Seriousness of the Offense; Promote Respect for the Law; Provide Just Punishment; Deter Criminal Conduct, and to Protect the Public from Further Crimes of Defendant

The Court must also consider "the need for the sentence imposed . . . to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense." 18 U.S.C. § 3553(a)(2)(A). The Court must also consider "the need for the sentence

imposed . . . to afford adequate deterrence to criminal conduct [and] to protect the public from

further crimes of the defendant . . ." 18 U.S.C. § 3553(a)(2)(B), (D).  The United States respectfully

submits that these factors also weigh in favor of a sentence within the Guidelines range calculated

by the United States. Given the seriousness of Defendant's offenses, the United States respectfully

submits that a sentence within the Guidelines range is required to adequately punish Defendant for

his crimes and to deter both Defendant and others from committing such crimes in the future.

**III.    UNITED STATES' SENTENCING RECOMMENDATION**

For all of the reasons outlined above, the United States respectfully submits that Defendant

should be sentenced to a term of 12 months' imprisonment for Count One, followed by a

mandatory consecutive term of 60 months' imprisonment for Count Two, for a total of **72** months'

imprisonment to be followed by a 36-month term of supervised release.

Respectfully submitted,

JEANINE FERRIS PIRRO
United States Attorney

By:        */s/  James B. Nelson*
           JAMES B. NELSON
           D.C. Bar No. 1613700
           Assistant United States Attorney
           Federal Major Crimes Section
           601 D Street, N.W.
           Washington, D.C. 20530
           (202) 252-6986
           james.nelson@usdoj.gov